Joseph O'CONNOR and Peter Horning, Plaintiffs,

v.

COMMONWEALTH GAS COMPANY and John Williams, Defendants.

No. CIV.A. 97–12792–MEL.

United States District Court, D. Massachusetts.

Feb. 23, 2000.

Donald P. Ricklefs, Ricklefs & Co., P.C., Boston, MA, David A. Miller, Michele P. Pilotte, Bruce H. Norwell, Ricklefs & Company, PC, Boston, MA, for Plaintiffs.

David S. Rubin, Epstein, Becker & Green, P.C., Boston, MA, for Defendants.

LASKER, District Judge.

Joseph O'Connor and Peter Horning challenge their former employer, Commonwealth Gas Company's, refusal to include them in a severance plan, the Personnel Reduction Program ("PRP"), which provided enhanced benefits to retirees. In their original complaint, the plaintiffs sought recovery on several theories, based variously on the Employee Retirement Income Security Act of 1974 ("ERISA"),[1] federal common law and state common law. In an earlier order, all of the plaintiffs' claims were dismissed except for their breach of fiduciary duty claims brought under sections 404, 409 and 502[2] of ERISA and their federal common law estoppel claims against the defendants. The defendants now move for summary judgment on these claims pursuant to Fed. R.Civ.P. 56(b). The plaintiffs respond that

---

**1.** Employee Retirement Income Security Act of 1974, Pub.L.No. 93–406, 88 Stat. 829 (codified as amended in scattered sections of 26 & 29 U.S.C.).

**2.** These sections of ERISA are codified at 29 U.S.C. § 1104, 1109, 1132 respectively. Section 1104 creates a "prudent person" standard of care which ERISA fiduciaries are subject. Section 1132 allows former employees, such as the plaintiffs, to sue for violation of that standard of care. Section 1109 makes a fiduciary personally liable for any such violation.

their state common law claims should be renewed because the severance plan is not an ERISA plan. In the alternative, the plaintiffs argue that even if ERISA is applicable, triable issues of fact exist concerning whether the enhanced severance plan was under "serious consideration" and whether the plaintiffs reasonably relied upon the defendants' "misrepresentations" when they decided to retire.

I conclude that the PRP is an ERISA plan and the plaintiffs' request to renew state common law claims is accordingly denied. The defendants are entitled to summary judgment on Horning's breach of fiduciary duty and estoppel claims. The defendants are also entitled to summary judgment of O'Connor's estoppel claim. Williams is entitled to summary judgment on O'Connor's breach of duty claim. O'Connor's breach of duty claim against Commonwealth Gas raises triable issues of fact.

$$*\quad*\quad*\quad*\quad*\quad*$$

## I.[3]

In 1995, faced with the prospect of increased competition due to energy deregulation, Commonwealth Gas, its sister company, Commonwealth Electric and its corporate parent, Commonwealth Energy System, began to consider cost cutting measures. One such measure being considered was the consolidation of Commonwealth Gas and Commonwealth Electric. On September 23, 1996, in the midst of these considerations, Horning gave notice that he would retire as of February 1, 1997.

By November of 1996, the Commonwealth companies were examining ways to reduce their workforce. At that time, a proposal called the "five and five" plan was considered by the System's Management Committee. This proposal was a retirement incentive plan that added five years of both age and service to participating employees for pension calculation pur-

poses. On November 21, 1996, the "five and five" plan was voted down by the Management Committee as being too costly.

Although the "five and five" plan was defeated, its consideration appears to have engendered speculation among Commonwealth Gas' employees about the company's plans. On December 2, 1996, Kenneth Margossian, the Chief Operating Officer of Commonwealth Gas, responded to this speculation by informing O'Connor and other senior managers that "there would be no incentives at this time to induce employees to retire." Margossian also stated that "he could not predict the possibility that incentives would be offered within the following year or within the next five years."

The December 2nd meeting did not end the speculation among employees at Commonwealth Gas. Understandably, considering his imminent retirement, Horning wanted to find out definitively if any new retirement incentive affecting him would be offered. Horning spoke with the defendant, Williams, who was Vice President for Human Resources and Corporate Affairs. Williams informed Horning that, "I don't think there's going to be anything that benefits you, Peter." Horning also spoke with Frank Tieuli, a close friend and the Personnel Manager. Tieuli told Horning that he had not heard anything about an enhanced benefit package, but "if something comes down, you'll probably get it anyway." Based on these statements indicating that no change in benefits was anticipated, Horning decided to change his retirement date from February 1, to January 1, 1997. On January 1, Horning retired.

The speculation about enhanced benefits also had an impact on how O'Connor viewed his retirement options. On December 19, 1996, O'Connor submitted notice that he would retire effective February 1,

---

**3.** While defendants dispute many of the allegations contained in this recitation of the facts, solely for purposes of this motion they have accepted these allegations as true.

1997. On January 6, 1997, the announcement was made to senior officers of the Commonwealth System that Commonwealth Gas and Electric would be consolidated. Facing imminent retirement in this speculative environment, on January 14th, O'Connor met with the Benefits Supervisor, Carol Cormier and handed her a letter purporting to make his retirement effective as of the date of any later incentive bonus. O'Connor wrote this letter on the advice of Victor DiNardo, the Director of Human Resources. DiNardo had given O'Connor this advice relying on a case which appears to be *Fischer v. Philadelphia Elec. Co.*, 96 F.3d 1533 (3rd Cir.1996)("*Fischer II*"). Following up on O'Connor's letter, DiNardo then stated that "[if an incentive plan was offered] O'Connor would probably not [be entitled to it] in a year but certainly within three or four months [O'Connor would] be entitled to benefits." With these assurances O'Connor retired on February 1, 1997.

On January 30, 1997, the plan for consolidation was described to the Commonwealth System's Board of Trustees. Then on February 6, 1997, the Commonwealth companies publicly announced that Commonwealth Gas and Electric would consolidate. They also announced that this consolidation plan would be accomplished, in part, through a "personnel reduction program we plan to offer to certain employees." Later in February, top executives began to meet to develop a plan for reducing personnel. By the middle of March, the first draft of the incentive severance plan had been created. At the end of March, the basic terms of the PRP were described to the Systems' Board of Trustees. On May 13, 1997, the PRP was offered to employees. After the PRP was instituted, plaintiffs sought but were denied benefits.

4. Consolidated Omnibus Budget Reconciliation Act of 1985, Pub.L.No. 99–272, 100 Stat. 82 (codified as amended in scattered sections of U.S.C.). COBRA provides eligible workers

## II.

### *The PRP Is An ERISA Plan*

As described in the written summary of the plan which was distributed to employees in May of 1997, the PRP provided the following enhanced retirement benefits to participants:

(I) A Severance Bonus–Participating employees were entitled to a certain number weeks of pay based upon years of service up to a maximum of one and one-half times annual compensation or seventy-eight weeks of pay at the time of separation from employment.

(II) Health and Dental Insurance Coverage–Commonwealth Gas offered to pay each participating employee's COBRA[4] health and dental insurance premiums for twelve months following the employee's termination date.

(III) Educational and Outplacement Assistance–Commonwealth Gas agreed to reimburse each participating employee up to $ 5,000 toward educational or outplacement services related to professional skill development. Educational reimbursement requests needed to be made within one year of an employee's termination.

(IV) A Pension Credit–Participating employees received a pension credit for the number of weeks represented by the PRP severance pay amount.

*See* Def.'s Mem. in Reply to P.'s Req. to Reinstate State Law Claims Exhibit 1 (the PRP plan documents).

As part of the PRP, Commonwealth Gas reserved the right to limit the number of participating employees to 300, stating that it would make any necessary determinations as to who could participate based

with the right to have their health and dental insurance obtained through their former employer continued for a limited time after leaving that employer.

on years of service. Commonwealth Gas also reserved the right to delay a participant in the PRP's date of termination for up to one year after their elected retirement date.

In opposing summary judgment the plaintiffs argue that their common law claims should be renewed because the PRP is not an ERISA plan. The plaintiffs contend that the PRP is not an ERISA plan "because it is based exclusively upon one-time benefits that are not within ERISA's purview." To support its position the plaintiffs rely on *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) and its progeny. The plaintiffs also persistently assert that the defendants' failure to make the proper filings pursuant to sections of the Code of Federal Regulations including, inter alia, 29 C.F.R. § 2520.101–1 and 29 C.F.R. § 2520.103–1 with the Secretary of Labor indicates that the PRP was not intended, or in fact, an ERISA plan.

The defendants respond that benefits provided by the PRP are not "one-time benefits" because they give rise to continuing financial and administrative obligations. The defendants also rely on *Fort Halifax* and ensuing circuit court opinions. The defendants deny that they failed to make necessary filings for the PRP with the Secretary of Labor. They argue that "the Taxpayers [sic] Relief Act of 1997[5] eliminated the requirement that [plan documents] be filed with the Secretary of Labor." The defendants also contend that "compliance with ERISA's reporting requirements has no bearing on the question of whether a plan is subject to ERISA." The defendants further respond that they intended the PRP to be an ERISA plan as additional evidence that the PRP was in fact an ERISA plan.

The PRP is an ERISA plan because Commonwealth Gas intended it to be an ERISA plan and in implementing the plan, Commonwealth Gas undertook continuing administrative and financial obligations which benefitted its employees. Although the PRP contains some elements that have been found standing alone to be insufficient to establish an ERISA plan, it also contains other components that have been found either to be strong evidence or indicative of an ERISA plan. The composite constructed from these parts demonstrates that the PRP is an ERISA plan.

*(A.) The Severance Bonus*

■ There is no dispute that PRP's one-time, lump sum severance bonus is insufficient to implicate ERISA coverage. In *Fort Halifax*, the Supreme Court held that an arrangement or mandate to make a lump sum severance payment upon the occurrence of a single event is not a "plan" under ERISA. Presented with a state statute requiring severance payments upon plant closings, the Court stated that:

> The requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control.... To do little more than write a check hardly constitutes the operation of a benefit plan.

*Fort Halifax*, 482 U.S. at 12, 107 S.Ct. 2211 (citations omitted).

*(B.) Commonwealth Gas' Right to Limit Participation in the PRP*

■ The defendants argue that Commonwealth Gas' right to limit the number of participants in the PRP to 300 based on years of service would create "continuing administrative obligations" indicative of ERISA coverage. The defendants posit

---

**5.** Taxpayer Relief Act of 1997, Pub.L.No. 105–34, § 1503, 111 Stat. 788 (codified as amended in scattered sections of 26 U.S.C.).

that "if invoked, the company would have to define and apply the concept of 'years of service.' This would have required the company to make numerous determinations." The defendants contend that this is the kind of administrative obligation that the First Circuit has recognized to fall within ERISA. They rely on *Simas v. Quaker Fabric Corp.*, 6 F.3d 849, 853 (1st Cir.1993)(holding that a state "tin parachute" statute created continuing administrative obligations because it involved nonmechanical decision making over an extended period of time to determine whether employees were fired "for cause" and whether they were eligible for unemployment according to state law).

Not surprisingly, the plaintiffs respond that Commonwealth Gas' right to limit participants did not create any "continuing administrative obligations." The plaintiffs cite *Rodowicz v. Mass. Mut. Life Ins. Co.*, 192 F.3d 162 (1st Cir.1999) (as amended 195 F.3d 65) as support for their position.

Commonwealth Gas' (unexercised) right to limit participants in the PRP does not implicate ERISA coverage. Commonwealth Gas' right, even if exerted, would not create the kind of administrative obligations that implicate ERISA coverage. The continuing administrative obligations, if any, that could arise from Commonwealth Gas' ability to limit participants in the PRP are even less significant, or likely, than those at issue in *Rodowicz.*

In *Rodowicz*, the Circuit Court affirmed de novo [6] the district court's determination that the plan at issue was not covered by ERISA. The plan in *Rodowicz* excluded employees who were "involuntarily terminated." The defendants made the very argument made here by the defendants relying on the inherent vagueness of the exclusion and *Simas*. The district court rejected this argument because unlike *Si-*

*mas*, the decision to deny benefits could be made immediately and no careful assessment involving state law would be required. These distinctions made in *Rodowicz* would be equally applicable in this case.

The PRP's exclusion of employees differs from those at issue in either *Rodowicz* or *Simas* in two important respects which provide further reasons why ERISA coverage is not implicated. First, the exclusion is contingent. While Commonwealth Gas had the right to limit the number of participants in the PRP to 300, it was under no obligation to do so. In fact, there is no evidence in the record that Commonwealth Gas actually did limit the number of participants. In both *Rodowicz* and *Simas*, the exclusion at issue categorically defined which employees would be given benefits. The benefit plans could not operate without defining the exclusion. In contrast, there would be no need to invoke the PRP's exclusion.

In *Fort Halifax*, the Court in finding that the statute at issue was not an ERISA plan, noted the contingent nature of the employer's obligation. The Court stated:

[T]he employer's obligation is predicated on the occurrence of a single contingency that may never materialize. The employer may well never have to pay the severance benefits.... The theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program.

*Fort Halifax*, 482 U.S. at 12, 107 S.Ct. 2211.

Similarly, the theoretical possibility that Commonwealth Gas may have limited the number of participants in the PRP creates

**6.** Prior to *Rodowicz*, the Circuit Court had applied a clear error standard of review when examining whether a plan was governed by ERISA. *See Belanger* 71 F.3d at 453. In *Rodowicz*, 195 F.3d at 65, "after giving this matter further thought, the panel believes that

the standard of review in the circumstances is de novo rather than clear error." Although the Circuit Court changed the standard of review, it found that "the alteration in review standard does not alter the outcome of the case." *Rodowicz*, 195 F.3d at 66.

no need for an ongoing administrative program.

Second, even if Commonwealth Gas had limited participation in the PRP, the defendants have not proven that this would have required it to have an ongoing administrative program. In *Simas,* the exclusion would have required the employer to make individualized determinations as to whether an employee was fired "for cause" or eligible for unemployment compensation according to state law. *See Simas,* 6 F.3d at 849. In *Rodowicz,* the exclusion of those "involuntarily terminated" arguably could have required the employer to make similar individualized determinations. *See Rodowicz v. Massachusetts Mut. Life Ins. Co.,* 915 F.Supp. 486, 490 (D.Mass.1996). Here, such individualized determinations would have been unnecessary. Unlike the "for cause" exclusion in *Simas,* the concept of "years of service" can be applied in a straight-forward manner that would not require individualized determinations. *Merkl v. Blue Cross and Blue Shield of Mass., Inc.,* 20 F.Supp.2d 188, 191 (1998) (determining the meaning of "years of service" in a severance plan does not require an ongoing administrative scheme which implicates ERISA).

*(C.) Commonwealth Gas' Right to Delay a Participant in the PRP's Date of Termination*

■ The defendants argue that Commonwealth Gas' right to delay a participant in the PRP's date of termination for one year resulted in continuing administrative obligations indicating ERISA coverage. The plaintiffs respond that *Rodowicz* found that an employer's right to delay a participant's termination does not entail ERISA coverage. In *Rodowicz,* 915 F.Supp. at 490, the District Court held that an employer's right to delay a participant's termination for six months does not indicate ERISA coverage because it would not impose any ongoing administrative obligations. While PRP's right to delay provision is one year, rather than six months,

this difference is not material. *Rodowicz 's* reasoning would be equally applicable here.

*(D.) Payment of COBRA Health and Dental Premiums*

■ The defendants contend that the clause of the PRP which provides that Commonwealth Gas will pay a plan participant's COBRA health and dental premiums for twelve months implicates ERISA. The defendants reason that the "ongoing financial and administrative obligations" which would accompany these payments are the type which require ERISA's protections.

The plaintiffs characterize the COBRA payments quite differently as a "one-time benefit" which is not covered by ERISA.

Standing alone, Commonwealth Gas' agreement to make COBRA payments would not implicate ERISA. In *New England Mut. Life Ins. Co., Inc. v. Baig,* 166 F.3d 1 (1st Cir.1999) the Circuit Court explained that:

A mere purchase of insurance by an employer is not sufficient to establish a plan under ERISA. Where insurance has been purchased by an employer, the crucial factor in determining if a 'plan' has been established is whether the purchase of the insurance policy constituted an expressed intention by the employer to provide benefits on a regular or long term basis. Similarly, whether a reasonable employee would perceive an ongoing commitment by the employer to provide employee benefits is an important consideration.

*Baig,* 166 F.3d at 4 (citations omitted).

Commonwealth Gas' agreement to make COBRA payments for one year could not have been intended or perceived as a commitment to provide benefits on a long term basis. Nor does "the mere obligation to pay the severance [benefits] over a period of time ... carry the day." *Merkl,* 20 F.Supp.2d at 191. In essence, Commonwealth Gas is required under this provision

to write a series of checks over a year. This short-term mechanical process would not require ERISA's protections to insure that the company's administrative and financial obligations are met. *See Wells v. General Motors Corp.*, 881 F.2d 166 (5th Cir.1989) (two-year installment payment option for severance payment did not implicate ERISA).

### (E.) The Pension Credit

■ The defendants contend that the PRP's pension credit brings the plan under ERISA. They analogize the PRP's pension credit to the pension credit in *Fischer II.* In *Fischer II*, the Third Circuit established and explained the "serious consideration" test for determining whether a plan administrator's representation that there will be no change in benefits is a breach of fiduciary duty. Although the court did not directly address the question of what constitutes an "ERISA plan," the conclusion that the operative plan was covered by ERISA is implicit in its opinion. The plan "included inducements such as a five year time-in-service [pension] credit, a five year age [pension] credit, and severance pay." *Fischer II*, 96 F.3d at 1536.

The plaintiffs respond that *Fischer II* is distinguishable and that "the credit to pensionable service was itself a one-time benefit."

The PRP's pension credit brings the plan under ERISA. While the pension credit in *Fischer II* is more generous than the PRP's, this difference is not material. As long as pension eligible participants in the PRP are alive, Commonwealth Gas will be obligated to pay benefits and administer its pension in a manner consistent with the PRP. These "ongoing [financial and administrative] obligations are uniquely vulnerable to employer abuse or employer carelessness, and thus require ERISA's special prophylaxis." *Belanger*, 71 F.3d at 455.

### (F.) Educational and Outplacement Services

■ The defendants contend that the funds which the PRP provides towards educational or outplacement services implicates ERISA. They reason that distributing these funds involves non-mechanical decision making when reviewing reimbursement requests to determine whether a course of study is related to occupational or professional skill development.

The plaintiffs complete response is that "the educational and outplacement assistance ... were one-time benefits based upon what other utilities offered in severance."

The PRP's provision of educational and outplacement services implicates ERISA. Commonwealth Gas' obligation to review a reimbursement request to determine if it is, "related to occupational or professional skill development" and within an employee's reimbursement limit is "an administrative obligation subject to abuse." *Baig* 166 F.3d at 4. Because this administrative obligation involves non-mechanical decision making and is subject to employer abuse, ERISA is implicated.

Commonwealth Gas' responsibility to provide outplacement services may also be an (unintentional) ongoing administrative and financial duty. It is unclear under the PRP whether Commonwealth Gas' duty to provide outplacement services would continue beyond the one-year time limit it sets for educational expenses. If the obligation was found to extend significantly beyond a year, its longevity (with the accompanying heightened risk of financial and administrative abuse or neglect over time) would provide a further reason for invoking ERISA's protections.

### (G.) Commonwealth Gas' Intent to Create a Welfare Benefit Plan

■ The defendants argue that it is relevant to the question of whether the PRP is an ERISA plan that it "was intended by the [c]ompany to be an ERISA plan and

was·drafted as such." The defendants assert that this is "clearly demonstrated in the PRP addendum, which explicitly references ERISA and describes employees' rights."

The plaintiffs respond that Commonwealth Gas "specifically designed [the PRP] to be outside ERISA's coverage." To support this contention the plaintiffs cite an array of deposition evidence tending to demonstrate that Commonwealth Gas sought to prevent the PRP from being considered an ERISA *pension* benefit plan. In addition, the plaintiffs argue that the "failure to comply ... [with the reporting requirements of ERISA is] evidence that [Commonwealth Gas] believed that the PRP was not within ERISA."

The evidence supports the defendants' contention that Commonwealth Gas intended the PRP to be an ERISA *welfare* benefit plan. It is irrelevant whether Commonwealth Gas may have designed the PRP to prevent it from being considered an ERISA pension benefit plan. Commonwealth Gas' desire to prevent the PRP from being considered the more stringently regulated type of ERISA plan has no bearing on whether it intended the PRP to fall under ERISA generally.

The plaintiffs' argument that the PRP is not an ERISA plan because the defendants "failed" to comply with the reporting requirements of ERISA (thus demonstrating their intent to fall outside of ERISA) is also incorrect. ERISA would be a frail law indeed if the failure to make filings with the Secretary of Labor removed retirement plans from its purview. In *Donovan v. Dillingham*, 688 F.2d 1367 (11th Cir.1982) (en banc), the Eleventh Circuit rejected this very argument. In *Donovan*, the Secretary of Labor sued an insurance trust for breach of its fiduciary duties under ERISA. The insurance trust responded, in part, that the plan at issue was not an ERISA plan because it was unwritten and therefore failed to comply with ERISA. In rejecting this argument the Court explained that:

[T]he policy of ERISA is to safeguard the well-being and security of working men and women and to appraise them of their rights and obligations under any employee benefit plan, *see* ERISA § 2, 29 U.S.C. § 1001, it would be incongruous for persons establishing or maintaining informal or unwritten employee benefit plans, or assuming the responsibility of safeguarding plan assets, to circumvent the Act merely because an administrator or other fiduciary failed to satisfy reporting or fiduciary standards.

*Donovan*, 688 F.2d at 1372.

The First Circuit is in accord with the *Donovan* court on this issue. *See Baig*, 166 F.3d at 5, n. 6 (1st Cir.1999); *Belanger*, 71 F.3d at 455.

The PRP's written documentation demonstrates that it was intended as an ERISA plan. In these releases Commonwealth Gas made its intent clear; "this information is provided in accordance with the disclosure requirements contained in Section 201 of the Older Workers Benefit Protection Act of 1990 (OWBPA), and the Employee Retirement Income Security Act of 1974, as amended (ERISA)." Def.'s Mem. in Reply to P.'s Req. to Reinstate State Law Claims Exhibit 1 (the PRP plan documents). The releases also contained a description of the PRP and employee's rights under the plan. The First Circuit has held that similar written support is compelling evidence that an employer has adopted an ERISA regulated plan:

[The company] distributed a handbook containing a listing of ERISA rights and a summary plan description. Such a booklet, detailing ERISA rights, is strong evidence that the employer has adopted an ERISA regulated plan.

*Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077, 1083 (1st Cir.1990).

An employer's expressed intent to create an ERISA plan has been described as "the crucial factor in determining if a plan has been established." *Belanger*, 71 F.3d at 455 (quoting *Wickman* ). Here, Com-

monwealth Gas' intent to establish an ERISA plan provides further support for the holding that the PRP was an ERISA plan.

In sum, "while the First Circuit has acknowledged that the application of Fort Halifax and its progeny sometimes involves hairsplitting," *Merkl,* 20 F.Supp.2d at 190, here, the process of hairsplitting indicates ERISA coverage. Commonwealth Gas intended the PRP as a welfare benefit plan. In addition, the PRP's pension credit and its education/outplacement benefits create ongoing financial and administrative obligations. These factors warrant ERISA's protections for affected employees.

### III.

*Plaintiffs' Breach Of Fiduciary Duty Claims*

The Plaintiffs claim that the defendants violated their fiduciary duties under ERISA as set forth in § 404 of the Act. Section 404 of ERISA provides, in pertinent part, that:

> A fiduciary shall discharge his duties with respect to a plan solely in the interest of participants and beneficiaries and-
> (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan;
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

Horning alleges that the statements made by Williams and Tieuli concerning the possibility of, and his inclusion in, an enhanced severance plan violated the defen-

dants' fiduciary duties. O'Connor alleges that the statements made by Cormier and DiNardo concerning his entitlement to an enhanced severance plan instituted after his retirement violated the defendants' fiduciary duties.[7]

### A. The Defendants Are Entitled To Summary Judgment On Horning's Breach Of Fiduciary Duty Claim

#### (I). Williams' Representation Was Not A Breach Of Duty

■ Horning argues that Williams' alleged statement, " I don't think that there's going to be anything that benefits you, Peter." was a positive and material misrepresentation which was a breach of the defendants' fiduciary duty. He contends that *Ballone v. Eastman Kodak Co.,* 109 F.3d 117 (2nd Cir.1997) is the "most apposite authority" for determining whether this statement was a breach of duty. Although Horning argues that this case is controlled by *Ballone,* he asserts that even under the test announced in *Vartanian v. Monsanto,* 131 F.3d 264 (1st Cir.1997) ("*Vartanian II* "), "there is a triable issue regarding whether the PRP was under 'serious consideration'" when Williams spoke with Horning.

The defendants respond that the facts here can not be distinguished from those in *Vartanian II,* where the Circuit Court found no breach of duty. Because the facts in this case can not be distinguished from *Vartanian II,* the defendants contend that the "serious consideration" test explained in that case applies. Applying the test, the defendants argue that no plan was under "serious consideration" when the alleged misstatements occurred.

The test announced in *Vartanian II* is both applicable and compels the dismissal of Horning's breach of fiduciary duty claims based on Williams' statement. In

---

7. To the extent that O'Connor argues that Williams breached a fiduciary duty owed to him, this argument is rejected. There is no evidence in the record that Williams either said or did anything that effected O'Connor's decision to retire. Moreover, in connection with this motion, the plaintiffs have not argued that Williams' decision to deny them benefits was a breach of duty.

*Vartanian II*, about two months before the plaintiff's planned retirement, he asked his immediate supervisor if there was going to be an early retirement plan providing enhanced benefits. The supervisor responded that "[the employer] was not contemplating any severance program for which [the plaintiff] would be eligible." *Vartanian II*, 131 F.3d at 267. A month later, the plaintiff again inquired whether there would be an enhanced severance package and was given a similar response. An enhanced severance plan for all employees was not presented to senior management until a month after the plaintiff retired. The plaintiff sued claiming that his supervisor had "misrepresented" that there would be no change in benefits.

The Circuit Court found that there had been no misrepresentation because material changes to the plaintiff's benefits were not under "serious consideration" when he spoke with his supervisor. *Vartanian II*, 131 F.3d at 272. The Court explained that a plan was under "serious consideration" when "(1) a specific proposal (2) is being discussed for the purpose of implementation (3) by senior management with the authority to implement the change." *Vartanian II*, 131 F.3d at 268 (quoting *Fischer II*, 96 F.3d at 1539).

In applying the "serious consideration" test to the facts, the Court held that:

> Not until . . . the meeting of senior managers [about a month after plaintiff retired] . . . is the point at which 'the three [factors] interacted and coalesced to form a composite picture of serious consideration,' giving rise to a fiduciary duty of disclosure.

*Vartanian II*, 131 F.3d at 272 (quoting *Fischer II*, 96 F.3d at 1539).

The facts here are strikingly similar to those in *Vartanian II*. Both plaintiffs asked about enhanced severance benefits and were told that their companies were not considering any enhanced benefits for which they would be eligible. It is clear from *Vartanian II* that the "serious consideration" test should be applied to Williams' representation. In this case,

there has been no misrepresentation because material changes to Horning's benefits were not under "serious consideration" when he spoke with Williams. At the earliest, the point at which "the three [serious consideration] factors interacted and coalesced," *Vartanian II*, 131 F.3d at 272, was not until mid-March when the first draft of what would become the PRP was created. This was over a month after Horning had retired and three months after Horning's conversation with Williams.

Horning's assertion that *Ballone* is "the most apposite authority" is incorrect. In *Vartanian II* 131 F.3d at 269, the Court noted that it had "no occasion to consider whether we would apply *Ballone* in an appropriate case" because there was no allegation of positive misrepresentation. Here, as in *Vartanian II*, there is no allegation of positive misrepresentation simply because an employer informs an employee that an enhanced benefit plan isn't under consideration.

### (II). Tieuli's "Representation" Was Not A Breach Of Duty

The parties make the same arguments with regards to Tieuli's statement that he had not heard anything about an enhanced benefit package, but "if something comes down, you'll probably get it anyway." As a threshold matter, Tieuli's statement is not a representation, much less a "material misrepresentation," of any kind. Tieuli's probabilistic statement, which was made between two close friends and co-workers of equal status can not be regarded as a representation by Commonwealth Gas. Even if Tieuli's statement is considered a representation, under *Vartanian II*, there has been no misrepresentation because material changes to Horning's benefits were not under "serious consideration" when he spoke with Tieuli.

### B. Commonwealth Gas Is Not Entitled To Summary Judgment On O'Connor's Breach Of Fiduciary Duty Claim

■ Although the parties make the same arguments with regards to Cormier

and DiNardo's statements to O'Connor, the nature of these statements leads to the application of a different test and result. The composite presented by O'Connor's allegations is that Cormier and DiNardo promised O'Connor that he would be given the benefits of a plan offered up to four months after his retirement. Perhaps most significant is DiNardo's alleged statement that "[if an incentive plan was offered] O'Connor would probably not [be entitled to it] in a year but certainly within three or four months [O'Connor would] be entitled to benefits."

In *Vartanian II* 131 F.3d at 269, the Court noted that it had "no occasion to consider whether we would apply *Ballone* in an appropriate case" because there was no allegation of positive misrepresentation. Since *Vartanian II*, the First Circuit has not had occasion to address this issue. While the Court in *Vartanian II* did not apply *Ballone*, it did observe that, "it seems reasonable that where an allegation of positive misrepresentation is involved, that 'aspect of the assurance can render it material regardless of whether future changes are under consideration at the time the misstatement is made.'" *Vartanian II* 131 F.3d at 269 (quoting *Ballone*, 109 F.3d at 124).

O'Connor makes such "an allegation of positive misrepresentation." Perhaps the clearest example of what is meant by "an allegation of positive misrepresentation" is the one at issue in the *Ballone* case itself. In *Ballone*, the plaintiffs contended that their employer affirmatively misrepresented to them that "it would implement no retirement plan enhancements [for at least two years]." *Ballone*, 109 F.3d at 121. The district court ruled that absent a change in benefits under "serious consider-

ation," these statements could not be material or misleading. The Second Circuit reversed. *Ballone*, 109 F.3d at 122. The Court held that "where an ERISA fiduciary makes guarantees regarding future benefits that misrepresent present facts, the misrepresentations are material if they would induce a reasonable person to rely on them." *Ballone*, 109 F.3d at 122.

O'Connor asserts that his employer actively misinformed him that their present position was that he would receive the benefit of any severance plan offered up to four months after his retirement. Given the nature of O'Connor's claims it is reasonable to apply the standard outlined in *Ballone*. *See Vartanian II* 131 F.3d at 269. Commonwealth Gas is not entitled to summary judgment on O'Connor's breach of fiduciary duty claim because where a positive misrepresentation is alleged, "serious consideration" need not be proven.[8]

\*     \*     \*     \*     \*     \*

## IV.

*The Defendants Are Entitled To Summary Judgment On The Plaintiffs' Estoppel Claims*

      The plaintiffs assert that the "representations" at issue in their breach of fiduciary duty claims are also grounds for estoppel claims based on the court's "interstitial lawmaking" powers under ERISA. *See Vartanian v. Monsanto*, 14 F.3d 697, 703 (1st Cir.1994) ("*Vartanian I*"). In *Vartanian I*, the First Circuit explained that despite its recognition that Congress "contemplated that the federal courts in the interests of justice, would engage in interstitial lawmaking in ERISA cases," it was unnecessary to consider whether plaintiff could bring a federal common law claim for misrepresentation

---

**8.** In their briefs the defendants suggest that O'Connor's decision to retire was "made" on December 19, 1996, and that therefore it is "impossible" that he could have relied upon Cormier and DiNardo's statements which were made close to a month later. The plaintiffs responded at oral argument that they could have amended their retirement date at any time. At oral argument defendants did not contest this assertion. In addition, Commonwealth Gas' acceptance of O'Connor's addendum and Horning's change in his date of retirement alone provides enough evidence for O'Connor's claim to withstand summary judgment on this issue.

when he could pursue his claim through the statutory channels provided in ERISA. *Vartanian I,* 14 F.3d at 703 (citation omitted). Because O'Connor may pursue his ERISA breach of duty claim, the same reasoning would apply to O'Connor's estoppel claim. The defendants are entitled to summary judgment on O'Connor's estoppel claim.

 The defendant's are also entitled to summary judgment on Horning's estoppel claim because he failed to establish the necessary elements to make such a claim. In *Law v. Ernst & Young,* 956 F.2d 364, 368 (1st Cir.1992), the Circuit Court explained the elements of an estoppel claim under federal common law:

> First the party to be charged must [ ] make [ ] a definite misrepresentation of fact to another person having reason to believe that the other person will rely upon it [ ] Second, the other party must rely reasonably on the misrepresentation to his detriment:

*Law,* 956 F.2d at 368 (citations omitted).

Williams and Tieuli's statements can not support an estoppel claim. Neither Williams nor Tieuli's statements involved any misrepresentation whatsoever. At the time these statements were made, Commonwealth Gas was not considering an enhanced severance plan. Tieuli's statement also can not support an estoppel claim because any reliance that Horning actually placed on this vague and probabilistic statement would not have been reasonable.

In sum, the PRP is an ERISA plan and the plaintiffs' request to renew state common law claims is accordingly *denied.* The defendants' motion for summary judgment is *allowed* as to Horning's breach of fiduciary duty claims; *allowed* as to Horning's estoppel claims; *allowed* as to O'Connor's estoppel claims; *allowed* as to O'Connor's breach of duty claim against Williams; and *denied* as to O'Connor's

breach of duty claim against Commonwealth Gas.

It is so ordered.