**Richard C. DONOVAN, Plaintiff,**

v.

**BRANCH BANKING AND TRUST COMPANY, a North Carolina qualified corporation, Defendant.**

**No. CIV.A. 2:02–0347.**

United States District Court,
S.D. West Virginia,
Charleston Division.

Sept. 11, 2002.

**562**

Sharon F. Iskra, Charleston, WV, for Plaintiff.

Michael D. Scott, Charleston, WV, for Defendant.

## MEMORANDUM OPINION AND ORDER

GOODWIN, District Judge.

Pending before the court is the plaintiff's request for discovery on the issue of whether the "Change in Control Severance Agreement" between the plaintiff, Richard C. Donovan, and One Valley Bank, the predecessor of the defendant, Branch Banking and Trust Company, constitutes a "plan" under the Employee Retirement Income Security Act of 1947 (ERISA), 29 U.S.C. § 1001, *et seq.* If ERISA preempts the plaintiff's claims, this court may not consider evidence outside of the administrative record. *Quesinberry v. Life Ins. Co. of N. Am.,* 987 F.2d 1017, 1026–27 (4th Cir.1993). The court, therefore, invited the parties to file briefs regarding the existence of a "plan" under ERISA. For the reasons that follow, the court **FINDS** that the Change in Control Severance Agreement is not a "plan" within the meaning of ERISA and **DENIES** the plaintiff's request for further discovery on that issue. Because there is diversity between the parties, this court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 (1996). The court will promptly enter a scheduling order.

## I. BACKGROUND

On October 21, 1999, the plaintiff, Richard C. Donovan, entered into a Change in Control Severance Agreement (CCSA) with One Valley Bank (OVB), the predecessor of the defendant, Branch Banking and Trust Company (BB & T). The CCSA between Donovan and OVB was assumed by BB & T under the Agreement and Plan of Reorganization between those two companies, effective February 6, 2000. A "Change in Control," as defined by the

CCSA, occurred on July 6, 2000. Officers of BB & T provided written acknowledgments that BB & T assumed Donovan's CCSA in letters dated June 22, 2000, and September 6, 2000.

Under the terms of the CCSA, severance benefits, including lump-sum monetary benefits and other benefits, were payable to Donovan if his employment was terminated without "cause" or if he left the company for "good reason" following a change in control of OVB. The CCSA explicitly defined "good reason" as "without Executive's express written consent, the occurrence of any of the following events after a Change in Control. . . ." One of the triggering events was a reduction in Donovan's annual base salary.

On May 1, 2000, BB & T offered Donovan a position as Cash Management Consulting Team Leader at a salary less than his previous salary at OVB. On June 7, 2000, Donovan accepted the position and corresponding salary, effective as of November 11, 2000. Although Donovan accepted the salary reduction, it did not actually occur until March 15, 2001, retroactive to February 15, 2001.

On August 2, 2001, Donovan terminated his employment with BB & T, effective September 7, 2001. At that time, Donovan claimed entitlement to severance payments under the CCSA and under the OVB Special Severance Policy (SSP). On August 15, 2001, BB & T notified Donovan that he was ineligible to receive benefits under the CCSA and the SSP because he did not resign for "good reason" as defined by the CCSA, and because he did not provide BB & T with the requisite notice.

Donovan filed a breach of contract claim in the Circuit Court of Kanawha County, West Virginia, on March 15, 2002, claiming entitlement to severance benefits under the CCSA. On April 16, 2002, BB & T removed the case to this court based on federal question and diversity grounds. In its notice of removal, BB & T asserted that the CCSA at issue is governed solely by ERISA and that Donovan's state law claims are preempted.

The parties held a Rule 26(f) planning meeting on May 14, 2002, in which they disagreed as to the applicability of ERISA and as to the permissibility of discovery. At the scheduling conference held on June 5, 2002, the court directed the parties to brief the issue of whether the CCSA is a "plan" under ERISA.

## II. DISCUSSION

### A. Applicability of ERISA

#### 1. Choice of Law

The main issue in this case is whether Donovan's breach of contract claim is preempted by ERISA. Donovan first argues that because the CCSA includes a West Virginia choice-of-law provision, state law and not ERISA controls the CCSA. Donovan notes that although the SSP is expressly subject to ERISA, the CCSA neither mentions ERISA nor attempts to comply with the reporting or disclosure requirements found in sections 402 and 102. *See* 29 U.S.C. §§ 1022, 1102; *Cecil v. AAA Mid–Atl., Inc.,* 118 F.Supp.2d 659, 663 (D.Md.2000) (citing *Varity Corp. v. Howe,* 516 U.S. 489, 531, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (Thomas, J., dissenting) ("ERISA does impose 'a comprehensive set of reporting and disclosure requirements,' which is part of 'an elaborate scheme . . . for enabling beneficiaries to learn their rights and obligations at any time.' " (internal quotations omitted))). As the Eighth Circuit has noted, however, a choice of law provision in a contract does not preclude the application of ERISA to a covered plan because "parties may not contract to choose state law as the governing law of an ERISA-governed benefit plan." *Prudential Ins. Co.*

*of Am. v. John Doe,* 140 F.3d 785, 791 (8th Cir.1998); *see also Donovan v. Dillingham,* 688 F.2d 1367, 1372 (11th Cir.1982) ("[T]here is no requirement of a formal, written plan in either ERISA's coverage section ... or its definitions section."). Thus, even though the CCSA is explicitly governed by West Virginia law and does not reference ERISA's comprehensive reporting and disclosure requirements, the court still must examine the CCSA to determine if it constitutes an ERISA "plan."

**2. What Constitutes an ERISA "Plan"**

■ The parties were asked by the court to brief whether the CCSA is an ERISA "plan." Section 514(a) of ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a) (1999). An "employee welfare benefit plan" is defined as "any plan, fund, or program ... to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants," *inter alia,* severance benefits. 29 U.S.C. § 1002(1)(B) (1999); *see also Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 7 n. 5, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) (explaining that severance benefits come within the definition of an employee welfare benefit plan); *Biggers v. Wittek Indus., Inc.,* 4 F.3d 291, 297 (4th Cir.1993) ("It is beyond question that plans established by an employer to provide severance benefits are employee welfare benefit plans within the scope of ERISA." (citations omitted)). Not every agreement that provides for the payment of severance benefits, however, is an ERISA plan. ERISA was intended to provide "for the federal regulation of *plans,* not merely *benefits." Emmenegger v. Bull Moose Tube Co.,* 197 F.3d 929, 934 (8th Cir.1999) (citing *Fort Halifax,* 482 U.S. at 11, 107 S.Ct. 2211). Therefore, ERISA will only be implicated if the benefits involved are administered according to a plan.

**3. The *Fort Halifax* Test**

The statutory definition provides little assistance in determining whether such a "plan" exists. *See Belanger v. Wyman–Gordon Co.,* 71 F.3d 451, 454 (1st Cir.1995) ("The text of ERISA itself affords scant guidance as to what constitutes a covered 'plan.' "). As a result, case law controls in determining whether a benefit program constitutes an ERISA plan. Significantly, the Fourth Circuit has not developed a specific framework to determine whether a benefit plan requires an administrative scheme. Thus, this court looks to the analytical framework provided by the Supreme Court and other jurisdictions.

■ In *Fort Halifax,* the Supreme Court established the seminal test for analyzing whether a severance plan is an ERISA-governed welfare benefit plan. *See* 482 U.S. at 11–13, 107 S.Ct. 2211. According to the *Fort Halifax* test, an employment contract or a state statute establishes a plan if the benefits provided require "an ongoing administrative program to meet the employer's obligation." *Id.* at 11, 107 S.Ct. 2211. *See also District of Columbia v. Greater Wash. Bd. of Trade,* 506 U.S. 125, 130 n. 2, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992) (stating that an ERISA plan requires "some minimal, ongoing 'administrative' scheme or practice").

■ Courts applying the *Fort Halifax* test have considered the following factors in determining the existence of an "ongoing administrative scheme": (1) whether the payments are one-time lump sum payments or continuous payments; (2) whether the employer undertook any long-term obligation with respect to the payments; (3) whether the severance payments come due upon the occurrence of a single,

unique event or whenever the employer terminates employees; and (4) whether the severance arrangement under review requires the employer to engage in a case-by-case review of employees. *See Emmenegger*, 197 F.3d at 934–35; *D'Oliviera v. Rare Hospitality Int'l, Inc.*, 150 F.Supp.2d 346, 351 (D.R.I.2001); *Gilmore v. Silgan Plastics Corp.*, 917 F.Supp. 685, 688 (E.D.Mo.1996) (surveying several cases from various jurisdictions and listing factors often considered in determining whether a severance agreement requires an "ongoing scheme"). Therefore, an inquiry into whether a severance agreement may be classified as an ERISA plan necessitates a fact-specific application of the above mentioned factors, "typically none of which on its own is determinative." *D'Oliviera*, 150 F.Supp.2d at 351 (citing *Belanger*, 71 F.3d at 455; *Champagne v. Revco D.S., Inc.*, 997 F.Supp. 220, 221 (D.R.I. 1998)).

### 4. Severance Benefits under the CCSA

#### a. Factors One and Two

■ The court first concludes that the benefits offered by BB & T to Donovan pursuant to the CCSA do not constitute an "ongoing administrative scheme" under the first two factors provided above. The CCSA provides Donovan with a single lump-sum payment upon the occurrence of a number of triggering events. The lump-sum payment must be paid within ten days following the date of termination. Significantly, the CCSA itself calls each payment a "lump-sum cash amount" and specifies the method of calculation.[1] Thus, simple, mathematical calculations control the amount of the payment and no ongoing administrative scheme is necessary. *See Kulinski v. Medtronic Bio–Medicus, Inc.*, 21 F.3d 254, 258 (8th Cir.1994). In other words, the calculation of benefits under the CCSA does not involve the exercise of a significant amount of discretion by BB & T.

The CCSA also provides Donovan with the "same level" of medical, dental, accident, disability, and life insurance benefits upon the same terms and conditions as existed immediately prior to Donovan's date of termination.[2] Although BB & T argues that these benefits require an ongoing commitment by the employer, the

---

**1.** The CCSA explains the method of calculation as the following:

> (1) a lump-sum cash amount equal to the sum of (A) Executive's unpaid base salary from the Company and its affiliated companies through the Date of Termination ... (B) any bonus payments which have become payable, to the extent not theretofore paid, and (C) any compensation previously deferred by Executive ...
> (2) ... a lump-sum cash amount equal to the target award for the Executive under such annual compensation plan for the fiscal year in which his Date of Termination occurs, reduced pro rata for that portion of the fiscal year not completed as of the end of the month in which such Date of Termination occurs; and
> (3) a lump-sum cash amount equal to the sum of (A) Executive's annual rate of base salary from the Company and its affiliated companies in effect immediately prior to

the Date of Termination ... plus (B) the average annualized bonus earned by the Executive from the Company (or its Subsidiaries) during the three fiscal years ... ending immediately prior to the ear of the Change of Control.

Def.'s Mem. of Law, Ex. A.

**2.** The CCSA also provided:

> (b) If, during the Termination Period the employment of Executive shall terminate, other than by reason of a Nonqualifying Termination, then for a period of twelve (12) months following the Date of Termination, the Company shall provide Executive ... with the same level of medical, dental, accident, disability, and life insurance benefits upon substantially the same terms and conditions ... as existed immediately prior to Executive's Date of Termination ...

Def.'s Mem. of Law, Ex. A.

court finds that there is nothing discretionary about the timing, amount, or form of these benefits. It is not material that these benefits are to be paid to Donovan over the course of one year. *See Delaye v. Agripac, Inc.*, 39 F.3d 235, 237 (9th Cir. 1994) ("While payment could continue for as long as two years, there is nothing discretionary about the timing, amount, or form of the payment."); *James v. Fleet/Norstar Fin. Group*, 992 F.2d 463, 466 (2d Cir.1993) ("The employee's option to receive the money in bi-weekly installments instead of in a lump sum did not change the basic situation."); *Wells v. Gen. Motors Corp.*, 881 F.2d 166, 176 (5th Cir. 1989) (stating that employee could elect to receive payment over two years instead of in lump sum and still not constitute an employee welfare benefit plan); *Herring v. Oak Park Bank*, 963 F.Supp. 1558, 1566 (D.Kan.1997) ("Nor is it material that some of the Agreement's triggering events provided for payment to plaintiff of the determined amount over a number of months."). To the extent that the CCSA requires the ongoing administration of benefits, this administration occurs pursuant to a pre-existing duly constituted benefits plan. *See Angst v. Mack Trucks, Inc.*, 969 F.2d 1530, 1538–39 (3d Cir.1992) (finding that neither the one-time payment nor the year of continued benefits at issue implicated ERISA). Thus, the CCSA's provision for a year of continued benefits is analogous to the CCSA's provision for a one-time lump-sum payment and does not require the creation of a new administrative scheme.

In sum, the benefits provided in the CCSA are in the form of a simple lump-sum payment plus a year of pre-existing benefits, and BB & T is not required to undertake any long-term obligation with respect to the payments. Therefore, the lump-sum cash payment and the one-year payment of medical, dental, accident, disability, and life insurance benefits do not require an ongoing administrative process.

### b. Factors Three and Four

The court also concludes that factors three and four indicate that the CCSA is not an ERISA plan. The severance payments come due upon the occurrence of specific triggering events, rather than at any time BB & T terminates its employees. This case is distinguishable from *Simas v. Quaker Fabric Corp.*, 6 F.3d 849 (1st Cir.1993), where the employer exercised a great deal of discretion because the employer first had to ascertain whether the employee would be eligible for unemployment compensation. *Id.* at 853. In this case, BB & T was not required to exercise great discretion in determining Donovan's eligibility for the payments; BB & T merely had to determine whether a triggering event had occurred. *See Herring*, 963 F.Supp. at 1568 (finding that the fact that one of an agreement's triggering events was bound to occur did not create an ongoing administrative scheme where none would otherwise exist). BB & T's decision as to whether a triggering event has occurred does not require an ongoing administrative scheme.

■ Finally, the court will examine whether the CCSA requires a case-by-case review of employees. BB & T asserts that it alone had the sole discretion to determine whether Donovan had committed an act giving rise to termination "for cause." As noted by the Ninth Circuit, however, although a termination "for cause" would change the employee's benefits, such "minimal quantum of discretion" is not always "sufficient to turn a severance agreement into an ERISA plan." *Velarde v. PACE Membership Warehouse, Inc.*, 105 F.3d 1313, 1317 (9th Cir.1997) (citing *Delaye*, 39 F.3d at 237).

In this case, the ability to terminate Donovan's employment "for cause" does

not carry such discretion as to create an ongoing administrative scheme. While a termination for cause would change the benefits due to the employee, this minimal quantum of discretion is not sufficient to turn a severance agreement into an ERISA plan. *See id.* (noting that the key to whether there is an ERISA plan is whether there is "*enough* ongoing, particularized administrative discretionary analysis" to make the plan an "ongoing administrative scheme," *not* that "the agreement simply required some modicum of discretion"). Significantly, the termination for cause provision was not listed as one of the triggering events; rather, the "for cause" language was included as a separate provision. *Id.; see Delaye,* 39 F.3d at 237 (finding that although a contract contained separate provisions pertaining to whether an employee was terminated "for cause," sending that employee a check every month plus continuing to pay his insurance premiums for the amount of time specified in the contract did not rise to the level of an ongoing administrative scheme). Therefore, the court finds that BB & T's performance under the CCSA does not require an ongoing administrative scheme.

Finally, BB & T asserts that it had the sole discretion to determine whether Donovan's resignation was for "good reason." BB & T argues that this component of the CCSA is evidence of an ongoing administrative scheme. This argument also fails. The CCSA in this case is similar to change-in-control-termination agreement at issue in *Kulinski. See* 21 F.3d at 255. The agreement in *Kulinski* provided that the employer would pay the employee a sum equal to 2.99 times his annual compensation in the event he was terminated, or for "good reason" resigned, within one year of a hostile takeover. *Id.* In the event the agreement's protections were invoked, the employer was required to pay the employee the lump sum due him within thirty days. *Id.* The Eighth Circuit concluded that once a hostile takeover occurred and the employee resigned for "good reason," there was no discretion for the employer to exercise and nothing for it to do but write a check. *Id.* at 258.

In this case, the CCSA does not explicitly state whether Donovan or BB & T had the right to determine what constituted "good reason," as defined by the agreement. The CCSA merely states: "Good reason means, without Executive's express written consent, the occurrence of any of the following events after a Change in Control." The CCSA, however, does give Donovan the ability to enforce the contract for "good reason" if he believes any of the listed events occur. In contrast, the definition of "good reason" does *not* give BB & T any discretion, such as reasons why it might choose to end Donovan's employment or how it might invoke or not invoke "good reason." Accordingly, there is no need for an administrative scheme to analyze Donovan's reasons for termination.

■ The CCSA is distinguishable from the plan in *Collins v. Ralston Purina Co.,* 147 F.3d 592 (7th Cir.1998), which required extensive analysis by an administrator of the reasons why *over sixty agreements* had been terminated. *Id.* at 594. Unlike the one-time disbursement for "good reason" in this case,[3] the *Collins*

---

**3.** Another factor that indicates the absence of a "plan" here is that the CCSA only related to one beneficiary. The Fourth Circuit has found that there is no "requirement that a plan must cover more than one employee in order to be controlled by ERISA." *Biggers,* 4 F.3d at 297. The existence of a single benefi-

ciary, however, "does suggest than an actual administrative program was not required for the Agreement's administration." *Herring,* 963 F.Supp. at 1568. Thus, although not determinative, this factor supports the court's conclusion.

court noted that "[i]t is exactly this prospect of multiplicity and record-keeping that distinguishes Collins' case from the one-time routine disbursement facing the Court in *Fort Halifax*." *Id.* at 596.

This case is also distinguishable from a case cited by BB & T in its brief, *Kosakow v. New Rochelle Radiology Assoc.*, 274 F.3d 706 (2d Cir.2001). In *Kosakow*, the arrangement was one where severance payments were not contingent upon a single event. Rather, the severance payments were offered without any date restriction, such that employees might perceive an ongoing commitment by the company. *Id.* at 736–37. Furthermore, the manual at issue in that case gave the employer unfettered discretion to determine if the employee was terminated for "sufficient cause," which would forfeit the benefits. *Id.* at 737. Finally, the amount of severance benefits at issue in *Kosakow* was not a fixed amount, but left the employer with discretion to determine the amount in each individual case. *Id.*

By contrast, in this case, the CCSA gives Donovan the discretion whether or not to invoke the "good reason" clause; "cause" is specifically and narrowly defined, rather than entirely a matter of BB & T's discretion; only designated events set forth in the Agreement can trigger severance and benefits; time limitations are stated explicitly; and the CCSA removes all discretion from BB & T as to the amount of benefits.

Thus, by satisfying the *Fort Halifax* test, this case falls within the line of cases finding that an arrangement requiring only a lump sum payment after a triggering event is not a "plan" under ERISA. *See Herring*, 963 F.Supp. at 1558 (citing *Velarde*, 105 F.3d at 1316 (stay-on bonus and severance pay); *Belanger*, 71 F.3d at 455 (early retirement offer); *Kulinski*, 21 F.3d at 257 (golden parachute); *James*, 992 F.2d at 466 (stay-on bonus); *Angst*, 969 F.2d at 1538 (buyout plan); *Fontenot v. NL Indus.*, 953 F.2d 960, 962 (5th Cir. 1992) (golden parachute); *Wells*, 881 F.2d at 176 (severance pay)).

## Conclusion

As many courts have acknowledged, the question under *Fort Halifax* is a matter of degree. *See Rodowicz*, 192 F.3d at 162. "[S]o long as *Fort Halifax* prescribes a definition based on the extent and complexity of administrative obligations, line drawing of this kind is necessary and close cases will approach the line from both sides." *Simas*, 6 F.3d at 854. Analysis of the CCSA and the relevant factors discussed in other cases convinces this court that the CCSA did not require an ongoing administrative scheme and thus did not constitute an employee benefit "plan" under ERISA. Accordingly, the court **DENIES** the plaintiff's request for further discovery on that issue. The fact that the court has determined that the CCSA is not a "plan" within the meaning of ERISA has no effect on Donovan's diversity claim for breach of contract. As to those claims, the court will promptly enter a scheduling order.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party, and **DIRECTS** the Clerk to post this published opinion at *http://www.wvsd.uscourts.gov*.