**Eric NADWORNY, Plaintiff,**

**v.**

**SHAW'S SUPERMARKETS, INC., Albertson's, Inc. Defendants.**

**No. CIV.A. 05–12077–WGY.**

United States District Court, D. Massachusetts.

Dec. 22, 2005.

Kevin T. Peters, Tricia A. Rice, Todd & Weld LLP, Boston, MA, for Eric Nadworny, Plaintiff.

Robert P. Joy, Robert P. Morris, Morgan, Brown & Joy, LLP, Boston, MA, for Albertson's, Inc., Shaw's Supermarkets, Inc., Defendants.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

## I. INTRODUCTION

The plaintiff Eric Nadworny ("Nadworny") initially filed a complaint in the Massachusetts Superior Court sitting in and for the County of Plymouth against the defendants Shaw's Supermarkets, Inc. ("Shaw's") and Albertson's, Inc. ("Albertson's"), alleging breach of contract. Nadworny alleges that his former employer, Shaw's, which was later acquired by Albertson's, breached its severance plan payment agreement with him by refusing to provide benefits enumerated in the agreement after Nadworny resigned from his position. Shaw's and Albertson's removed the action to this Court and now move to dismiss with prejudice pursuant to Fed. R.Civ.P. 12(b)(6) and 12(b)(1). The basis for Shaw's and Albertson's Rule 12(b)(6)

motion to dismiss is that Nadworny's breach of contract claim is preempted by the federal Employee Retirement Income Security Act ("ERISA"). Alternatively, they move to dismiss on Rule 12(b)(1) grounds, as federal subject matter jurisdiction is conditioned upon this Court's ruling that ERISA governs this dispute. Nadworny also has moved for remand to the Plymouth Superior Court on the ground that the severance agreement does not fall under ERISA and this Court, therefore, lacks jurisdiction.

The parties' motions present two questions to this Court. First, whether ERISA preempts the breach of contract claim because the parties' severance agreement constitutes an "employee benefit plan" within the meaning of ERISA. Second, whether the suit ought be dismissed for failure to state a claim upon which relief may be granted.

## II. BACKGROUND

This action commenced on September 16, 2005, when Nadworny filed a complaint against Shaw's and Albertson's in Plymouth Superior Court. [Doc. No. 6, Attach. 1]. On October 14, 2005, Shaw's and Albertson's filed a notice of removal to the United States District Court for the District of Massachusetts on the basis of complete preemption by ERISA. [Doc. No. 1]. On October 19, 2005, Shaw's and Albertson's filed a motion to dismiss for failure to state a claim, arguing that, due to ERISA preemption, Nadworny was owed no relief for breach of contract. Defs.' Mot. Dismiss [Doc. No. 4] at 1. On November 2, 2005, Nadworny filed an opposition to the motion to dismiss, and a motion for remand to the Plymouth County Superior Court, asserting that ERISA did not apply to the Shaw's severance agreement. [Doc. Nos. 7, 8].

Nadworny was employed by Shaw's Human Resources Department from November 30, 1998 through February 4, 2005. Compl. ¶¶ 6, 14. On April 30, 2004, Albertson's acquired Shaw's, thus becoming Nadworny's employer. *Id.* ¶ 7. Prior to the acquisition, Nadworny's title was "Vice President, Associate & Labor Relations"; after the acquisition, his title became "Vice President, Labor Relations in the Legal Department." *Id.* ¶ 14. Nadworny alleges that his job responsibilities, in addition to his job title, changed after the Albertson's acquisition. *Id.* ¶¶ 15–24. He details the changes in his complaint, to illustrate what he alleges to be substantial and material changes to his position, entitling him to severance benefits under the severance agreement he entered into with Shaw's prior to the Albertson's acquisition. *Id.*

Nadworny's supervisory responsibilities were diminished following the change in control. Prior to the change, Nadworny reported directly to a member of the executive committee, whereas after the change, he reported to Tom Walter ("Walter"), Vice President of Labor Relations. *Id.* ¶ 15. Nadworny thereby became the only Vice President at Albertson's who reported to a peer, rather than to a member of the executive committee. *Id.* In addition, subsequent to the change in control, the directors in Nadworny's department who reported to him prior to the acquisition began reporting to Walter instead, making his the only department within Albertson's in which the vice president and the directors reported to the same superior. *Id.* ¶ 16. In addition, human resources staff members, other than the directors, who were once under Nadworny's supervision, did not report to him after the acquisition. *Id.* ¶ 17.

Nadworny contends that his responsibilities in other matters changed as well. Various other responsibilities assigned to

Nadworny under the Shaw's structure were given instead to Walter subsequent to the Albertson's acquisition. *Id.* ¶ 19. Under Albertson's structure, Nadworny also lost his previously held authority to hire his staff and other positions in the human resources department, the authority to make management decisions such as determining salaries and bonus targets and checking references, and opportunities to have input in hiring for various other positions not directly under his supervision. *Id.* ¶ 18. Walter, rather than Nadworny, became the chief contact person with unions, assumed responsibility for selecting outside counsel, set the annual budget, and established labor relations policies, among other things. *Id.* ¶ 19. In addition to Nadworny's exclusion from communications with parties outside the corporation for whom he had previously been the primary contact person, *id.* ¶ 19, his communications with the executive committee were also curtailed. *Id.* ¶ 20. Prior to the acquisition, Nadworny played an instrumental role in the strategic planning and design of the human resources department, afterwards, Walter assumed these responsibilities and Nadworny was excluded from departmental meetings about these matters. *Id.* ¶ 23. Walter replaced Nadworny as chief negotiator for the corporation. *Id.* ¶ 21. After the Albertson's acquisition, the company communicated the changes in Nadworny's responsibilities to the unions and to Shaw's and Albertson's operational leadership, by identifying Walter as head of labor relations in various written documents. *Id.* ¶ 22. Finally, Nadworny's stock option benefits under Shaw's control were terminated after Albertson's assumed control. *Id.* ¶ 24.

In anticipation of the Albertson's acquisition, Shaw's implemented a severance agreement, the purpose of which was to " 'provide certain severance benefits to El-igible Employees in the event that their employment with the Company or its successor is terminated under certain circumstances after the occurrence of the Change in Control.' " *Id.* ¶ 8. According to the agreement, an employee could be eligible for the benefits if terminated by the company "without Cause" within twelve months of the change in control, or if the employee resigned "for Good Reason" within twelve months of the change in control. *Id.* ¶ 9.

On January 21, 2005, Nadworny submitted his letter of resignation, indicating that he was ending his employment for "[g]ood [r]eason," under the terms of the severance agreement. *Id.* ¶ 25. He continued working until February 4, 2005. *Id.* ¶ 26. On January 21, 2005, Nadworny, in writing, requested benefits under the severance agreement. *Id.* ¶ 27. Albertson's denied his benefits claim on April 9, 2005. *Id.* ¶ 28. Nadworny appealed the benefits denial on May 18, 2005, and requested information to which he believed he was entitled pursuant to the severance agreement. *Id.* ¶ 29. On July 14, 2005, Albertson's denied the appeal and refused to provide most of the information Nadworny had requested. *Id.* ¶ 30. Nadworny thus exhausted the administrative appeal procedure available under the agreement. *Id.* ¶ 32.

Nadworny maintains that he is entitled to his annual salary plus 150% of his annual bonus in severance, pursuant to the severance agreement. *Id.* ¶ 10. He maintains that he is an "[e]ligible [e]mployee," as he worked in a corporate management capacity, primarily at the company's headquarters. *Id.* ¶ 12. Nadworny asserts that he is eligible for the severance benefits because his resignation was for "[g]ood [r]eason," in that it was caused by a material diminution in his title, duties, and responsibilities, and a material reduction or

adverse change in his benefit plans. *Id.* ¶¶ 34–41. Nadworny is adamant in his contention that ERISA does not preempt the severance agreement, that he is owed relief under a breach of contract theory only, and that a federal court therefore lacks subject matter jurisdiction over the dispute. *See generally* Pl.'s Mem. Opp. Defs.' Mot. Dismiss and in Supp. of Pl.'s Mot. Remand ("Pl.'s Mem.") [Doc. No. 8].

## III. DISCUSSION

### A. Standard of Review for ERISA Preemption

All factual allegations in Nadworny's complaint are assumed to be true, and the Court draws inferences in Nadworny's favor when considering Shaw's and Albertson's motion to dismiss. *Coyne v. City of Somerville,* 770 F.Supp. 740, 743 (D.Mass. 1991) (Cohen, M.J.). "[D]ismissal is warranted only if 'it appears beyond doubt that [Nadworny] can prove no set of facts in support of [his] claim which would entitle [him] to relief.'" *Coyne, Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)) (second and third alterations in original). Nadworny, however, must put forth "factual allegations, either direct or inferential, specifying each material element necessary to sustain recovery under some actionable legal theory." *Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 515 (1st Cir.1988). This Court has determined that Nadworny has put forth factual allegations sufficient to support a claim against Shaw's and Albertson's. Although this Court has determined that ERISA preempts the breach of contract claim, it will not dismiss Nadworny's action as Shaw's and Albertson's have requested. Rather, Nadworny will be given leave to amend his complaint to request judicial review of his employer's denial of benefits under an employee benefit plan covered by ERISA.

Although this dispute began with Shaw's and Albertson's moving to dismiss for both failure to state a claim upon which relief can be granted and lack of subject matter jurisdiction, having determined that Nadworny has made factual allegations that support a cause of action, this Court need address only the jurisdictional issue raised under the Federal Rules of Civil Procedure.

 Discerning whether federal jurisdiction over this matter is proper pursuant to Fed.R.Civ.P. 12(b)(1) is a mixed question of fact and law. Here, although the party seeking removal to federal court generally bears the burden of establishing that jurisdiction is proper, *In re County Collector,* 96 F.3d 890, 895 (7th Cir.1996), because ERISA Section 502(a)(1)(B) provides for exclusive original federal jurisdiction over ERISA matters, *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987), this Court's primary concern is not whether the removing party has met its burden of proof but rather whether Shaw's severance agreement is an employee benefit plan within the meaning of ERISA. *See Belanger v. Wyman–Gordon Co.,* 71 F.3d 451, 453 (1st Cir.1995).

### B. ERISA Preemption

Albertson's and Shaw's argue that the breach of contract claim is entirely preempted by ERISA, while Nadworny asserts that the severance benefit agreement is not an "employee benefits plan" within the meaning of ERISA, and therefore is not preempted. *See generally* Def.'s Mem. Supp. Mot. Dismiss [Doc. No. 5]; Pl.'s Mem.

Section 1144(a) of ERISA provides that "the provisions of this title . . . shall supersede any and all State laws insofar as they may now or hereafter relate to any em-

ployee benefit plan ...." 29 U.S.C. § 1144(a). Thus, ERISA will supersede the breach of contract claim based upon Shaw's severance agreement insofar as the claim "relates to" an employee benefit plan. This raises two initial questions: (1) whether the severance agreement constitutes an "employee benefit plan," and, if so, (2) whether Nadworny's breach of contract claim "relates to" the employee benefit plan. *Hampers v. W.R. Grace & Co., Inc.*, 202 F.3d 44, 49 (1st Cir.2000). The controversy in this matter focuses upon the first. If this Court determines that the severance agreement *is* an employee benefit plan, there is little doubt that the issue of its breach "relates to" that benefit plan. *See, e.g., Turner v. Fallon Community Health Plan*, 127 F.3d 196, 199 (1st Cir.1997) ("It would be difficult to think of a state law that 'relates' more closely to an employee benefit plan than one that affords remedies for the breach of obligations under that plan.").

■ Since the statutory language of ERISA is unclear on this point, the Court must resort to case law to discern whether a benefit program constitutes an ERISA plan. *O'Connor v. Commonwealth Gas Co.*, 251 F.3d 262, 266 (1st Cir.2001). The leading case in this realm is *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). *See Rodowicz v. Massachusetts Mut. Life Ins. Co.*, 192 F.3d 162, 170 (1st Cir.1999); *Belanger v. Wyman–Gordon Co.*, 71 F.3d 451, 454 (1st Cir.1995); *Simas v. Quaker Fabric Corp.*, 6 F.3d 849, 852 (1st Cir. 1993). While *Fort Halifax* and other case law provide useful guidance, each case requires an individualized analysis based upon its unique facts and circumstances. This often forces courts to make nuanced and discriminating determinations where precedent indicates the case could well be determined in either party's favor. *O'Con-*

*nor*, 251 F.3d at 267; *Rodowicz*, 192 F.3d at 172; *Belanger*, 71 F.3d at 455 ("In this cloudy corner of the law, each case must be appraised on its own facts."); *Simas*, 6 F.3d at 854 ("[L]ine drawing ... is necessary and close cases will approach the line from both sides."); *Collins v. Ralston Purina Co.*, 147 F.3d 592, 597 (7th Cir.1998) ("[I]t is not easy to draw a line in a case such as this one ...."). As a general matter, some "prospect of conflict" between a federal statute and state law must be evident to justify disabling the state law. *Fort Halifax*, 482 U.S. at 19, 107 S.Ct. 2211. In an ERISA case, this requires a conclusion that allowing a state cause of action to proceed would counter Congress's purposes for passing ERISA. *See id.*

■ ERISA may preempt state court actions involving employee benefit *plans*, but will not reach adjudication of employee *benefits*, if the benefits are not part of a benefit *plan*. *Fort Halifax*, 482 U.S. at 6–7, 107 S.Ct. 2211; *see also O'Connor*, 251 F.3d at 267. Since "[t]here is no authoritative checklist that can be consulted to determine conclusively if an employer's obligations rise to the level of an ERISA plan[,]" *Belanger*, 71 F.3d at 455, the Court's analysis must focus on the "nature and extent" of the benefits. *Id.* at 454. In comparing Nadworny's case with governing precedents in order to discern whether the parties' severance benefits constitutes an ERISA plan, this Court has considered a number of interrelated, overlapping factors.

■ Questions of ERISA preemption require a court to view the benefit program before it in light of Congress's purposes for enacting ERISA: the protection of employees' and employers' interests and rights with regard to employee benefits administration. *Belanger*, 71 F.3d at 454; *see also Ingersoll–Rand Co. v. McClendon,*

498 U.S. 133, 137–38, 142, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990); *O'Connor*, 251 F.3d at 266 (noting the "[p]aramount" importance of safeguarding the interests of employees). A "[p]articularly germane" factor in this regard is the extent to which the administrator of the benefits must exercise discretion, as opposed to following a mechanical formula, in implementing the plan. *O'Connor*, 251 F.3d at 267. The more that subjective judgments are required of the administrator, the more likely the plan is to fall within the purview of ERISA. *Id.* Another factor, closely related to the question of whether the administrator must exercise discretion, is whether the benefits are disbursed on an ongoing, or one-time, basis. *Belanger*, 71 F.3d at 455. One-time, lump sum payments of benefits frequently are found to be too discrete and temporary to constitute a "plan," and deemed not to be preempted by ERISA. *O'Connor*, 251 F.3d at 268. Third, where the employer's obligation to disburse benefits is triggered by a single event, *Fort Halifax* indicates that preemption is less likely to be appropriate. 482 U.S. at 12, 107 S.Ct. 2211. Also pertinent is whether the employer assumed a long-term obligation to review claims and make payments. *Belanger*, 71 F.3d at 455; *Collins*, 147 F.3d at 597.

### 1. Purposes of ERISA

In determining whether ERISA preempts a state law, Congressional intent in passing ERISA, particularly the preemption provision, is paramount among the Court's considerations. *Ingersoll–Rand Co.*, 498 U.S. at 137–38, 111 S.Ct. 478; *Fort Halifax*, 482 U.S. at 8, 107 S.Ct. 2211. " 'ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employment benefit plans.' " *Ingersoll–Rand Co.*, 498 U.S. at 137, 111 S.Ct. 478 (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85,

90, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)). ERISA preemption is far reaching, and may be appropriate even where the preempted state law only indirectly affects the employee benefit plan. *Id.* at 139, 111 S.Ct. 478 (citing *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987)). Congress intended for ERISA preemption to protect the interests of both employees and employers. *See Fort Halifax*, 482 U.S. at 9–11, 107 S.Ct. 2211; *Belanger*, 71 F.3d at 454.

■ In the interest of protecting employers, Congress enacted the ERISA preemption provision to "ensure that plans and plan sponsors would be subject to a uniform body of benefits law ... [in order to] minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government." *Ingersoll–Rand Co.*, 498 U.S. at 142, 111 S.Ct. 478; *see also Belanger*, 71 F.3d at 454 ("[T]he Supreme Court has made it very clear that an employee benefit may be considered a plan for the purposes of ERISA only if it involves the undertaking of continuing administrative and financial obligations ...."). The goal was to preclude conflicts in substantive law among the states, as each individual state acted pursuant to its common law powers. *Ingersoll–Rand Co.*, 498 U.S. at 142, 111 S.Ct. 478; *Fort Halifax*, 482 U.S. at 9, 107 S.Ct. 2211. Congress reasoned that the establishment of a "uniform administrative scheme ... provid[ing] a set of standard procedures to guide processing of claims and disbursement of benefits[ ]" would most efficiently satisfy the needs of both employers and employees. *Fort Halifax*, 482 U.S. at 9, 107 S.Ct. 2211 (emphasizing the interests of *employers* in having a uniform, national employee benefits system). Where the employer is obligated to make only a one-time payment to a beneficiary, this pur-

pose is not furthered through ERISA preemption. Where the employer must make periodic or ongoing payments, however, the uniformity of the law is highly pertinent. *Id.* at 12, 107 S.Ct. 2211; *Belanger,* 71 F.3d at 454.

Congress also intended for ERISA preemption to protect the interests of employee-beneficiaries of benefit plans. Specifically, ERISA is geared toward "safeguard[ing] the financial integrity of employee benefit funds, ... permit[ting] employee monitoring of earmarked assets, and ... ensur[ing] that employers' promises are kept." *Belanger,* 71 F.3d at 454 (citing *Fort Halifax,* 482 U.S. 1, 15, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987)).

 2. Ongoing versus One Time Payment Obligations, Lump Sum versus Periodic Payments and Span of Time During which Employer is Obligated.

■ A "very important" consideration in ERISA preemption disputes is whether, in light of all the facts and circumstances, the employee reasonably could believe that the employer has an ongoing commitment to provide benefits. *Id.* at 455. A court's finding that an employer has an obligation to disburse benefits on a long-term or periodic basis weighs in favor of ERISA preemption, while a finding that a benefit plan consists solely of an obligation to make a single, lump sum payment of benefits weighs against preemption. *Fort Halifax,* 482 U.S. at 12, 107 S.Ct. 2211; *Belanger,* 71 F.3d at 455.

The Shaw's severance agreement indicates that an eligible beneficiary "will receive his/her severance payment in a lump sum." Compl. *Ex.* A ("Severance Pay Plan") § IV.[1] Lump sum payments weigh against finding preemption in part because the amounts to be paid usually are determined by a straightforward calculation based upon the employees' salaries and years of service with the organization. *See, e.g., Fort Halifax,* 482 U.S. at 12, 107 S.Ct. 2211; *Simas,* 6 F.3d at 851. The force of this factor stems in large part from the fact that benefit plans that require only single, lump sum payments tend to demand less of the administrator in terms of rendering judgments of eligibility and managing the program and fund than do plans that entail ongoing or periodic payment schemes. *See Fort Halifax,* 482 U.S. at 12, 107 S.Ct. 2211; *Belanger,* 71 F.3d at 455–56; *Simas,* 6 F.3d at 853.

While it is true, as Nadworny argues, that Shaw's and Albertson's obligations under the severance agreement constitute a one-time, lump sum payment of benefits, as in other cases where the courts have determined that ERISA does not preempt a state law, Pl.'s Mem. at 6–7, several of the cases Nadworny cites in support of his argument are distinguishable from his own case. The holdings in *O'Connor, Rodowicz,* and *Belanger* for instance, were decided under different facts; in those cases, the employers offered early retirement packages indiscriminately to their employees as a means of encouraging attrition. *O'Connor,* 251 F.3d at 268–69 (holding em-

---

**1.** Although courts generally may not consider the weight of evidence in ruling on a motion to dismiss, it is proper for this Court to consider the contract between the parties on this motion to dismiss because it was included as an exhibit appended to Nadworny's complaint. It was also cited by Shaw's and Albertson's in their memoranda in support of their motion to dismiss and in opposition to plaintiff's motion to remand. It is well established that, under these circumstances, the Court's consideration of the appended documents does not convert a motion to dismiss into a motion for summary judgement. *See LoCicero v. Leslie,* 948 F.Supp. 10, 12 (D.Mass.1996); *see also Fudge v. Penthouse Int'l Ltd.,* 840 F.2d 1012, 1015 (1st Cir.1988).

.

ployer's retirement incentive package that mechanically calculated and offered to a broad class of employees indiscriminately, did not implicate ERISA); *Rodowicz,* 192 F.3d at 166 (upholding district court ruling that ERISA did not preempt where incentive retirement package was at issue); *Belanger,* 71 F.3d at 452 (holding that serial offer of retirement plans did not implicate ERISA); *see also White v. Bell Atlantic Yellow Pages,* No. 01–10157–DPW, 2004 WL 594957, *9, 2004 U.S. Dist. LEXIS 4720, *26 (D.Mass. Mar.23, 2004) (Woodlock, J.) (holding one-time retirement incentive package was purely automatic and non-discretionary and thus not under the rubric of ERISA). In those cases, the offer of benefits was extended to all employees or to a large group of age-eligible employees.

While Shaw's and Alberton's severance package similarly provides for a lump sum payment of benefits when an employee leaves the employ of the company, Nadworny's case is distinguishable from *Belanger, Rodowicz,* and *O'Connor* in that the circumstances under which each company offered the benefits speaks to the degree of discretion the plan administrator must exercise in determining employee eligibility for the benefits. Under the Shaw's agreement, the plan administrator would have to determine the eligibility of each claimant on a case-by-case basis, whereas the *Belanger, Rodowicz,* and *O'Connor* employers were encouraging employees to accept the benefits and retire, and under the state statute in *Fort Halifax,* employers had no choice but to provide benefits. Here, in contrast, Shaw's and Alberton's have no evident motive or statutory obligation to disburse benefits to any laid-off or resigning employee. Therefore, it is to be expected that the Shaw's plan administrator would evaluate each claim to ensure that the company does not pay more benefits than the administrator deems necessary according to the terms of the agreement. Indeed, Nadworny's charge against Shaw's and Albertson's stems from his disagreement with the administrator's determination, based upon the administrator's interpretation of the facts of Nadworny's case and the company's obligations under the agreement, that Shaw's and Albertson's are not obligated to disburse benefits to Nadworny. This is the very nature of a plan administrator's discretionary decision.

Nadworny also relies on the seminal *Fort Halifax* case to support his argument. Pl.'s Mem. at 5–9. In *Fort Halifax,* the Supreme Court held that ERISA did not preempt a Maine state statute that obligated all employers who closed or transferred their facilities to pay employees a lump sum based upon each employee's weekly salary and years of service. 482 U.S. at 12, 107 S.Ct. 2211. The statute at issue in *Fort Halifax* is distinct, however, from the situation Nadworny brings before this Court insofar as the statute in *Fort Halifax* provides for an automatic payment to *all* employees upon the occurrence of a particular event. *Id.* at 4, 107 S.Ct. 2211. In *Fort Halifax,* there was no initial determination of eligibility requiring discretionary judgment on the part of the administrator because, under the statute, all employees were automatically eligible. *Id.* Under the particular facts before it, the *Fort Halifax* Court was able to determine that a one-time, lump sum payment obligation, instigated by the occurrence of a particular event was sufficient to rule that ERISA does not preempt the statute at issue. *Id.* at 12, 107 S.Ct. 2211.

Although Nadworny argues to the contrary, the *Fort Halifax* decision alone cannot serve as adequate guidance to this Court, because the Supreme Court's rationale for that ruling does not apply so readily here. In *Fort Halifax,* the Court ruled that the distribution of benefits in

accordance with the Maine statute would not require employers to establish an administrative scheme; if the triggering event were to occur, the employer simply would have to pay benefits to all employees based upon a straightforward calculation. *See id.* at 16–17, 107 S.Ct. 2211. The *Fort Halifax* Court itself recognized this distinction, noting that in a previous case it had ruled preemption to be proper where the employer had committed to pay benefits *"as each person left employment"* because, in that case, the employer would have to establish an administrative scheme to pay benefits on an ongoing basis. *Id.* at 18 & n. 10, 107 S.Ct. 2211 (citing *Gilbert v. Burlington Indus., Inc.*, 765 F.2d 320 (2d Cir.1985), *summarily aff'd*, 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 558 (1986)) (emphasis added).

■■■ No single factor dictates whether ERISA shall preempt. Rather, the various factors courts consider are meant merely to guide each court's inquiry into whether the benefits program before it falls within the purview of an employee benefits plan for which Congress enacted ERISA, i.e., whether the purposes behind ERISA are furthered by applying it in that case.

Given that the Shaw's agreement does not provide for automatic disbursement of benefits to a broad class of employees upon the occurrence of a certain event, this Court rules the one-time, lump sum nature of benefits disbursement under the Shaw's severance agreement is not determinative of the question of ERISA preemption.

### 3. Triggering Event

When the employer's obligation to distribute benefits is triggered by the occurrence of a particular contingency, one-time, lump sum payments are an especially strong indication that the benefits do not fall within an employee benefit plan, within

the meaning of ERISA. *Fort Halifax*, 482 U.S. at 12, 107 S.Ct. 2211. Shaw's obligation to pay severance benefits to Nadworny is contingent, at minimum, upon Nadworny leaving the employ of Shaw's and Albertson's within twelve months of the change in control. *See* Severance Pay Plan § III. Nadworny argues that this is a single triggering event, and that it warrants a ruling that preemption is not appropriate in this case. Pl.'s Mem. at 8.

Nadworny's point is well-taken; indeed, his case is similar to other cases in which single triggering events informed rulings that ERISA did not preempt another cause of action. *See Fort Halifax*, 482 U.S. 1, 107 S.Ct. 2211; *Belanger*, 71 F.3d 451; *Donovan v. Branch Banking & Trust Co.*, 220 F.Supp.2d 560 (S.D.W.Va.2002); *Herring v. Oak Park Bank*, 963 F.Supp. 1558 (D.Kan.1997). This Court is mindful, however, that it ought consider various factors in light of the overall facts and circumstances of the case, and no one factor in insolation.

In *Simas v. Quaker Fabric Corp.*, the statute in question conditioned an entitlement to severance benefits upon a single, one-time occurrence: a corporate takeover. 6 F.3d at 853. Though cognizant of the general principle that where the occurrence of a single event gives rise to an employer's obligations to disburse benefits, the benefits are less likely to constitute an ERISA plan, the *Simas* court nevertheless held that ERISA preempted the statute because of the weight of various other factors. *Id.* The *Simas* court also disputed whether it could rightfully be deemed a "single triggering event" where various employees could claim benefits during an extended period of time. *See id.; see also Collins*, 147 F.3d at 595 (observing that, under a plan offering benefits to some managerial employees who lost their jobs shortly after a corporate acquisition, the

employer "faced the prospect of multiple payments to various managers, at different times and under different circumstances[,]" and that there was thus no true *single* triggering event); *Bogue v. Ampex Corp.*, 976 F.2d 1319, 1323 (9th Cir.1992) *cert. denied*, 507 U.S. 1031, 113 S.Ct. 1847, 123 L.Ed.2d 471 (1993) ("Although the program ... was triggered by a single event, that event would occur more than once, at a different time for each employee ... [and t]here was no way to carry out that obligation with the unthinking, one-time, nondiscretionary application of the plan administrators in *Fort Halifax* ....."). Similarly, eligibility for benefits under the Shaw's severance agreement could be triggered numerous times during the twelve-month period during which it was in effect, as various individual eligible employees resigned from, or were discharged by, the corporation.

Thus, it is not at all clear that the case law supports Nadworny's argument that the contingency of the Shaw's severance agreement has but one, single triggering event. Under the Shaw's agreement, eligible employees might submit claims for benefits to Shaw's and Albertson's individually, over the course of a twelve-month period following the change in control. *See* Severance Pay Plan § III. Although Nadworny points to the change in control as the "triggering effect," Pl.'s Mem. at 8, the events that ultimately might trigger an obligation to pay under the agreement would be either a dismissal of an employee without "cause" or an employee's resignation for "good reason." These factors render Nadworny's case meaningfully different from *Fort Halifax*, where the employer was required to pay benefits to all employees immediately after the occurrence of a single event. The Shaw's severance plan is more similar to the Massachusetts "tin parachute" statute at issue in *Simas*, in that both the Shaw's agreement

and the tin parachute statute allow for payment of benefits to employees who lose their jobs in the midst of a corporate takeover. 6 F.3d at 851; Severance Pay Plan Preamble. Although the employer in *Simas* was obligated to make only lump sum payments, rather than installment payments, the *Simas* court ruled that because individual employees could demand benefits under the plan, separately from one another, and over the course of a three-year period, this statute was within the purview of ERISA. *Id.* at 853.

Similarly, in *Collins v. Ralston Purina Co.*, the Seventh Circuit determined that because the employer would have to consider individual claims during a one-year period, the severance agreement was an employee benefit plan within the meaning of ERISA. 147 F.3d at 596. Likewise, the court in *Bogue v. Ampex Corp.* held that an obligation to pay benefits during a "short term" of seventeen months following a corporate takeover, contingent upon a the new management's denial of "substantially equivalent work" to the employee "required the sort of discretionary decision-making by the plan's administrator that is the hallmark of an ERISA plan." 976 F.2d at 1322. Like the statute at issue in *Simas* and the *Collins* and *Bogue* severance agreements, the Shaw's severance agreement renders certain employees eligible for benefits within a specified period of time (twelve months) following a change in corporate control. The rationale undergirding the *Simas* and *Collins* decisions also supports this Court's conclusion that there was no single triggering event of the kind in *Fort Halifax* giving rise to Shaw's obligation to pay benefits under the Severance Pay Plan. *See Simas*, 6 F.3d at 851; *Collins*, 147 F.3d at 595–96. Therefore, this factor of the ERISA preemption analysis leads this Court to rule that ERISA preempts the state cause of action.

4. Discretionary Functions of Benefits Administrator

The extent to which the benefits administrator must exercise discretion in the discharge of his duties is likewise a significant factor in determining a question of ERISA preemption because it is indicative of the complexity of the benefit program. *See O'Connor*, 251 F.3d at 267 ("The determination of what constitutes an ERISA plan thus turns most often on the degree of an employer's discretion in administering the plan."); *Bogue*, 976 F.2d at 1323 (ruling that a plan requiring "case-by-case, discretionary application" of the terms required an administrative scheme, and thus brought the benefits plan within the scope of ERISA even though the term of the employer's obligation to pay was short and the number of participants was small); *see also Rodowicz*, 192 F.3d at 171; *Belanger*, 71 F.3d at 455 (holding benefit program that entailed a "purely mechanical determination of eligibility" and did not require any discretionary judgment on the part of the administrator was not an ERISA plan). As such, this factor relates to both the employer's interest in having a uniform system under which to administer the benefit plan, and to the employee's interest in ensuring that the employer does not abuse its discretion in the disbursement of benefits.

Nadworny argues that the administrator of the severance agreement benefits plan was not required to exercise significant discretion in determining whether he was eligible for benefits, and the extent of any such benefits for which he might be eligible. *See* Pl.'s Mem. at 9–15. Shaw's and Albertson's contend that the administrator was, in fact, required to "exercise considerable judgment in deciding whether benefits were payable." Defs.'s Mem. Supp. Mot. Dismiss at 7.

Under the terms of the Shaw's severance agreement, there are three areas in which the plan administrator might have to exercise discretion relevant to this particular case: (1) whether a given employee is "eligible" for consideration under the plan, (2) whether a lay-off was "without Cause," and (3) whether an employee resigned "for Good Reason." *See* Severance Pay Plan §§ II–III. Although the severance agreement provides definitions for all three of these terms, the definitions themselves evidence the amount of discretion the administrator might be required to use. For purposes of determining whether the employer had "Cause" to discharge the employee, the administrator might consider the following:

(a) failure to substantially perform his or her job duties, after written notice from the Company . . . provided however that such failure to perform shall not constitute "Cause" unless the Company can clearly establish that the employee's performance level had materially declined from his performance level prior to the Change in Control as reflected in the Company's personnel records; . . . (c) conviction of . . . a felony or a crime involving moral turpitude; (d) material or gross insubordination to the Company's . . . officers, managers or supervisory personnel; (e) the intentional, unauthorized disclosure . . . of . . . information . . . that is significant and/or material to the respective entity's operation; or (f) expressly threatening to cause, or repeatedly or intentionally causing, damage to the relations of the Company . . . .

Severance Pay Plan § V.

Whether the employee has resigned for "Good Reason" might require the administrator to discern what constitutes a "material change in the performance criteria for

annual performance bonuses", a "material diminution ... in the Eligible Employee's title, duties, or responsibilities," or a "material reduction or material adverse change in the employee benefit plans, in the aggregate ...." *Id.* It may also require the administrator to define the boundaries of "crime[s] involving moral turpitude," or to determine whether a disclosure of information was "intentional" and "unauthorized." *Id.* The terms "materially" and "substantially" that pervade the definition section indicate that decisions about an employee's qualification for benefits in most cases would require at least some exercise of the administrator's discretion.

This portion of the contract defining "Cause" also suggests that the administrator might have to make factual determinations about the nature of an employee's crime and the employee's intent when disclosing confidential information about the company. Thus, the administration of benefits under the Shaw's agreement would entail more than mere mechanical calculations, as Nadworny suggests. Pl.'s Mem. at 10. That the agreement provides for "administration and appeal of decisions," Severance Plan Agreement § VI, and details the "claims procedure," *id.* at § IX, also suggest that the administrator would be required to make individualized, discretionary assessments of each employee's qualifications to receive benefits under the agreement.

The *Simas* court, in considering whether ERISA preempted a statute effective during a two-year period following a corporate change in control, and which required the administrator to determine whether employees were discharged for cause within the meaning of that statute, determined that "[t]he 'for cause' determination, in particular, is likely to provoke controversy and call for judgments based on information well beyond the employee's date of hiring and termination." 6 F.3d at 853. While recognizing that such determinations may sometimes be "straightforward," the *Simas* court ruled that the statute's terms imposed enough administrative obligations to rule that the statute created an employee benefit plan within the scope of ERISA. *Id.* (distinguishing the case from *Fort Halifax* on the basis of administrative obligations, though recognizing that, as in *Fort Halifax*, the benefit agreement provided for a one-time, lump sum payment of benefits).

Similarly, in *Collins v. Ralston Purina Co.*, the court found an agreement requiring the employer to assess whether an employee's job responsibilities were "substantially reduced" set a standard that was "hardly an easily discernible one" and ruled that ERISA preempted state law claims because the agreement necessitated an ongoing administrative scheme. 147 F.3d at 596. Noting that it was not an easy task to determine whether the agreement crossed the line that divided mere employee "benefits" that did not constitute "plans" within the meaning of ERISA from "employee benefit plans" subject to ERISA preemption, the *Collins* court ultimately determined that that agreement did cross the line because it required the administrator to "exercise discretion on an ongoing basis[,] using certain criteria ... [and] required [the administrator] to make that decision as often as once per manager ...." *Id.* at 597; *see also Bogue*, 976 F.2d at 1325 (ruling that administrator's authority to make factual assessments, such as whether an employee's job after a change in control is "similar" to her prior, constituted a discretionary function). The striking factual similarities between the Shaw's severance agreement, the statute in *Simas*, and the agreement in *Collins* support this Court's conclusion that ERISA preempts Nadworny's state law claim.

Nor does Nadworny's citation to *D'Oliviera v. Rare Hospitality Int'l, Inc.* in support of his contention that the Shaw's administrator does not exercise discretion in disbursing benefits persuade this Court. Pl.'s Mem. at 12–13. The severance plan at issue in *D'Oliviera* rendered *all* salaried employees eligible to receive benefits automatically *unless* the employee was terminated for "gross misconduct." 150 F.Supp.2d 346, 351 (D.R.I.2001). The agreement further listed sixteen acts that amounted to "gross misconduct." *Id.* at 353. Although the agreement in *D'Oliviera* differs from the statute in *Simas* and the agreement in *Rodowicz* because of its restriction upon employees' eligibility, like *Simas* and *Rodowicz*, the severance benefits in *D'Oliviera* applied automatically to a broad class of employees. Furthermore, the list of sixteen acts that could disqualify an employee for benefits allowed for substantially less administrator discretion than the Shaw's agreement.

On the other hand, Nadworny does make a plausible argument that simply requiring the exercise of "discretion" by a severance agreement administrator is insufficient to transmute the severance package into an ERISA plan. Pl.'s Mem. at 9. Nadworny relies heavily on two unpublished opinions to support his assertion that discretionary decisions as to whether employees are eligible for benefits do not usually support a finding that a benefits program is an ERISA plan. *See id.* at 9–10 (citing *Lettes v. Kinam Gold, Inc.*, 3 Fed.Appx. 783 (10th Cir.2001); *Wright v. ObjectStream, Inc.*, No. C 02–630 SI, 2002

WL 1579350 (N.D.Cal. July 15, 2002))[2]. At least one case cited by Nadworny, *Donovan v. Branch Banking & Trust Co.*, 220 F.Supp.2d 560 (S.D.W.Va.2002) squarely supports his argument in this regard. In *Donovan*, the court determined that a severance agreement entered into in anticipation of a corporate acquisition did not require discretion of the administrator adequate to bring the agreement under ERISA, even though, like the Shaw's agreement, it forced the administrator to determine whether the employee resigned for "good reason." *Id.* at 566–67.

To the extent *Donovan* reaches a different conclusion than *Simas* and *Collins* based on similar facts, this Court is faced with conflicting precedent and the question is an extremely close one.

This Court follows the *Simas/Collins* line, albeit with misgivings, given that *Simas* was decided by the First Circuit Court of Appeals and both *Simas* and *Collins* appear to be the more widely accepted decisions. Moreover, this Court is obliged to defer to ERISA's broad, sweeping powers of preemption as articulated by the Supreme Court. *See Ingersoll–Rand Co.*, 498 U.S. at 138–39, 111 S.Ct. 478. It appears in this case, however, that leaving discretion in the hands of an interested administrator may result in an arbitrary decision to the detriment of a potentially-eligible employee. The fiduciary obligations imposed on the administrator, *Varity Corp. v. Howe*, 516 U.S. 489, 496, 511, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (explaining that ERISA protects beneficiaries "by setting forth certain gen-

---

**2.** The fact that these two decisions are unpublished does not, of course, subtract from their persuasive authority. *See Anastasoff v. United States*, 223 F.3d 898, 899–905 (8th Cir.2000) (R. Arnold, J.), *vacated as moot*, 235 F.3d 1054 (8th Cir.2000) (en banc) (holding that unpublished opinions have precedential effect); *see also Alshrafi v. American Airlines,* *Inc.*, 321 F.Supp.2d 150, 160 n. 9 (D.Mass. 2004); *but see Hart v. Massanari*, 266 F.3d 1155, 1158 (9th Cir.2001) (Kozinski, J.) (observing that unpublished opinions of the Ninth Circuit Court of Appeals are not binding precedent and generally may not be cited to or by courts within the circuit.)

eral fiduciary duties" which apply to the management of plans and that "a plan administrator engages in a fiduciary act when making a discretionary determination about whether a claimant is entitled to benefits under the terms of the plan documents"), are the only safeguards against this result.

## IV. CONCLUSION

■ As is the case in many similar disputes, the answer to the question whether the parties' severance agreement constitutes an employee benefit plan is an extremely close one. Were the existence of a one-time, lump sum payment of benefits upon the occurrence of a particular event the sole criterion to which this Court was directed to look, Nadworny might be correct in his argument that ERISA does not preempt his breach of contract claim. There are, however, various other factors for this Court to consider in making its ultimate determination, especially the extent to which the benefit plan administrator is required to exercise discretion in distributing benefits. Furthermore, here there is not truly one, single contingency triggering Albertson's and Shaw's obligation to pay benefits. That obligation to disburse benefits may be triggered each time an eligible employee is laid-off or resigns from the company within twelve months of the change in control.

While the fact that the Shaw's severance agreement provides for a lump sum payment weighs in favor of a holding that ERISA does not preempt, the fact that, under the terms of the agreement, the administrator must make decisions as to the eligibility of each employee claiming benefits on a case-by-case basis weighs more heavily in favor of ERISA preemption. In light of all of the facts and circumstances of this case and governed by First Circuit precedent, this Court holds

that the Shaw's Severance Pay Plan is an employee benefit plan.

The result may seem perverse: this Court seemingly is saving Nadworny from himself, where Nadworny expressly does not want the protections of ERISA and the federal jurisdiction that Congress designed for such situations. Nevertheless, Congress did not draft ERISA so that it would be optional to each claimant. As this Court rules that the severance agreement meets the ERISA criteria of being an employee benefit plan, it must maintain jurisdiction over the matter.

Accordingly, Nadworny's Motion to Remand [Doc. No. 7] is DENIED.

■ This Court also DENIES Shaw's and Albertson's motion to dismiss [Doc. No. 4], provided Nadworny, within 30 days of the date of this decision, amends his complaint to drop his claim for breach of contract and to request judicial review of Shaw's and Albertson's denial of benefits under the Severance Pay Plan, pursuant to ERISA.

While Nadworny's complaint will not be dismissed, it is important to focus on what he has lost now that ERISA governs. Most important, it appears he has lost his right to trial by jury, with all the concomitant public values that right ensures. *See Andrews–Clarke v. Travelers Ins. Co.,* 984 F.Supp. 49, 63 n. 74 (D.Mass.1997). Instead, this Court must defer to the administrator's determination (despite suggestions of conflict) so long as that determination is not arbitrary—or must it?

Surely this is not the procedure Congress envisioned. This Court follows it only because it is mandated from above.

Commentators increasingly argue that the Supreme Court envisions a role for the jury here. *See* Donald T. Bogan, *ERISA: Re-thinking* Firestone *in light of* Great–West *—Implications for Standard of Re-*

view and the *Right to a Jury Trial in Welfare Benefit Claims*, 37 J. Marshall L.Rev. 629, 639–40 (2004) ("In a breach of contract lawsuit, a trial judge does not defer to any litigants' declarations of facts or interpretation of contract terms." *Id.* at 630); Mark D. DeBofsky, *The Paradox of the Misuse of Administrative Law in ERISA Benefit Claims*, 37 J. Marshall L.Rev. 727, 742–43 (2004); William M. Acker, *Can the Courts Rescue ERISA?*, 29 Cumb. L.Rev. 285, 295–300 (1999). A jury could, of course, weigh fiduciary obligations and administrator decisions better than any other institution as it is the nation's most vital expression of direct democracy.